IN THE UNITED STATES DISTRICT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SEAN A. SOUELS,<br><br>    Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>    Respondent. | Civil No. 1:15-cv-07563(JBS)<br><br>[Relates to Cr. No. 10-510-05 (JBS)<br><br>**MEMORANDUM**<br><br>**OPINION** |

**SIMANDLE, District Judge:**

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Petitioner Sean Souels entered a plea of guilty on September 4, 2014, to conspiracy to commit wire fraud contrary to 18 U.S.C. § 1343, in violation of 18 U.S.C. § 1349. United States v. Souels, Cr. No. 10-510-05 (JBS). Souels admitted he conspired with others as part of a mortgage fraud scheme involving properties in the Wildwood, New Jersey area. Upon his violation of conditions of release, his bail was revoked on March 24, 2015, and he has been in custody since March 27, 2015. [Docket Item 259.]

He was sentenced on May 14, 2015, to 46 months' imprisonment following a hearing in which the Court determined his Total Offense Conduct (TOC) level was 23 and his Criminal History Category (CHC) was III, yielding an advisory Sentencing Guidelines range of 46 to 57 months.

In this timely petition under 28 U.S.C. § 2255, Mr. Souels principally asserts that his sentencing level was erroneous due to a loss calculation that incorrectly determined the amount of loss under U.S.S.G. § 2B1.1(b)(1).

His amended petition, filed November 2, 2015 [Docket Item 3], seeks to set aside his sentence pursuant to § 2255 based on three grounds, which may be paraphrased as follows:

1. The sentence violates the Mandatory Victim Restitution Act of 1996 by using a short sale price rather than a fair market value to determine the amount of the victim's loss.

2. The sentence is illegal because the PSR incorrectly implied the property was foreclosed when the victim financial institution actually sold it at a short sale that canceled the original loans, rendering the loss zero.

3. Defense counsel provided ineffective assistance in acquiescing to the loss amount of $253,256.23 when in fact there was no loss to the victim.

In pleading guilty to wire fraud conspiracy, without a written plea agreement, on the eve of trial, Souels admitted, among other things, that he conspired in 2007 with Darryl Henry and Jerry Smith to devise a scheme and artifice to defraud a mortgage lender to grant purchase money mortgage loans to a straw purchaser through means of a false mortgage application and HUD-1 settlement statement in connection with the sham purchase of Unit 203 at 401 East Stockton Road, Wildwood, New Jersey. (Tr. Sept. 4, 2014 at 23-37.)

In his detailed factual colloquy, Souels testified that he was guilty as charged in Count One of the Second Superseding Indictment. (Id. at 23:18-24.) He admitted he was the pastor of the ReBirth International Church in Union County, New Jersey in 2007, and that he recruited a young naive female member of his congregation, K.P., to be the nominal purchaser of this property at the New Jersey shore under a scheme devised by co-conspirator Jerry Smith, who was involved in the real estate business. (Id. at 23:25-25:4.) Souels provided false information to a mortgage broker that K.P. was employed by his church as "president of operations," when in fact K.P. was not a church employee. (Id. at 25:3-10; 26:11-24.) Souels admitted he knew K.P. could not afford a mortgage for $413,000, or even for a lesser amount such as $299,000. (Id. at 27:5-19.)

Souels admitted that he was aware K.P. brought no money to the closing, and he does not dispute that the HUD-1 settlement statement falsely indicated that she brought approximately $136,900 to the closing to serve as a down payment. (Id. 28:8-29:19.)[1] He admitted that he received approximately $30,000 of the illegal excess proceeds from the sale which funds were deposited by a co-conspirator into K.P.'s account, to which Mr. Souels had access and expended funds for his own benefit, including mortgage expenses for his own home and car payments for his own car and for travel. (Id. at 29:20-34:14.) Through these false and fraudulent documents, he caused Gateway Funding to release the

---

[1] Indeed, Souels also admitted he encouraged Ms. K.P. to sign a false and fraudulent Uniform Residential Loan Application and a false HUD-1 Settlement Statement in connection with this mortgage loan application and closing. (Tr. Sept. 4, 2014 at 34:22-35:5.)

purchase mortgage funds. (Id. 36:3-10). Petitioner does not dispute that the false mortgage loan application and false HUD-1 settlement statement caused the lender to extend two mortgage loans in the total amount of $478,256.26 for K.P.'s straw purchase of Unit 203.

At sentencing, consistent with the Presentence Report for this property at Unit 203, the loss figure was calculated to be $253,256.26. (PSR ¶39; Tr. May 14, 2015 at 23:7-8.) This loss figure was computed as follows. Gateway Funding extended a total of $478,256.26 in two separate mortgage loans ($411,901.19 plus $66,355.07) for K.P.'s purchase of Unit 203. No mortgage payments were made by anyone. West Coast Servicing had acquired the loan from Gateway in a pool of loans in December of 2007. (Statement of Steve J. Kraemer, President of West Coast Servicing, Inc., in FBI 302 by Special Agent Stefanowicz (Nov. 20, 2008), attached to Gov't Br. at Ex. D (hereinafter "Kraemer Report")). After taking possession of the property on April 10, 2008, West Coast Servicing resold the property for $225,000.00, resulting in a loss of $253,256.26. (Final PSR ¶95);[2] Kraemer Statement, supra, at Gov't Br., Ex. D. The loss of $253,256.26 resulted in a 12-level enhancement under U.S.S.G. § 2B1.1(b)(1)(G), to which there was no objection at sentencing.[3]

---

[2] The same figures appeared in the Draft PSR, attached to Gov't Br., Ex. A, at ¶94.

[3] Souels' counsel successfully objected to inclusion in the loss amount of a second alleged mortgage fraud transaction involving Souels' property at 27-29 Voorhees Street, Newark, New Jersey. At sentencing, after a hearing, the Court sustained Souels' counsel's objection, finding that that mortgage transaction was not relevant conduct within the charged conspiracy. Accordingly, the alleged loss amount was reduced from $602,177.26 for the two properties to

4

Petitioner now alleges that this loss calculation was erroneous and that his counsel was constitutionally ineffective for failing to object. The United States has timely filed its Answer.[4]

The United States argues that the first two grounds, alleging a miscalculation of loss in the PSR, should be dismissed for lack of jurisdiction under § 2255, and that the third ground, alleging ineffective assistance of counsel with regard to the loss amount determination, should be denied for lack of merit. These arguments are next considered.

## II. DISCUSSION OF LAW

### A. Grounds One and Two: Subject Matter Jurisdiction

The United States seeks dismissal of Grounds One and Two for lack of jurisdiction under § 2255. Petitioner seeks to use the vehicle of a § 2255 motion to seek review of an alleged methodological error in computing loss amount under the mandatory restitution provision of the Antiterrorism and Effective Death Penalty Act of 1996, 18 U.S.C. § 3663A and under the U.S. Sentencing Guidelines, § 2B1.1(a)(2). The United States correctly points out that these are claims of a non-constitutional dimension.

Section 2255 provides in pertinent part:

---

$253,256.26 for Unit 203. See Tr. May 14, 2015 at 7:7-21:11; 22:22-23:12. The sentencing, as noted, was premised only on the loss caused by fraud in the Wildwood transaction.

[4] The Government's Answer was timely under the Court's prior Order filed June 16, 2016, which granted an enlargement of time through July 25, 2016 [Docket Item 10]. Petitioner's motion to deny a second continuance [Docket Item 13] is dismissed as moot.

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence... may move the court... to vacate, set aside or correct the sentence....

28 U.S.C. § 2255. The United States asserts most courts of appeals have held, barring extraordinary circumstances, that claims of non-constitutional error in the application of the Sentencing Guidelines cannot be raised in a § 2255 motion, Gov't Opp. at 4-5 (citing Knight v. United States, 37 F.3d 769, 773 (1st Cir. 1994); Graziano v. United States, 83 F.3d 587, 589-90 (2d Cir. 1996) (per curiam); United States v. Pregent, 190 F.3d 279, 283-84 (4th Cir. 1999); United States v. Payne, 99 F.3d 1273, 1281-82 (5th Cir. 1996); Grant v. United States, 72 F.3d 503, 505-06 (6th Cir. 1996); Buggs v. United States, 153 F.3d 439, 443 (7th Cir. 1990); Auman v. United States, 67 F.3d 157, 160-61 (8th Cir. 1995); United States v. Schlesinger, 49 F.3d 483, 485 (9th Cir. 1994); Burke v. United States, 152 F.3d 1329, 1331-32 (11th Cir. 1998). But cf. United States v. Talk, 158 F.3d 1064, 1069 (10th Cir. 1998) (assuming without deciding that claim of nine-level Guideline error that would reduce 108-month sentence by more than 50 months is cognizable)). The Third Circuit does not appear to have directly addressed this jurisdictional issue.

The Government thus argues that a motion under § 2255 is a collateral attack upon the legality of a sentence, citing In re Dorsainvil, 119 F.3d 245, 249 (3d Cir. 1997), for which the grounds are limited, United States v. Addonizio, 442 U.S. 178, 184 (1979). The § 2255 petition is to be granted only if the sentence results "in a fundamental defect which inherently results in a

6

complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure." Hill v. United States, 368 U.S. 424, 428 (1962); United States v. Cleary, 46 F.3d 307, 311 (3d Cir. 1995).

In other words, the ordinary means for correcting sentencing errors in the application of the U.S. Sentencing Guidelines or the determination of obligations to victims under the restitution provisions of 18 U.S.C. §§ 3663A, et seq., is by direct appeal, while sentencing errors of a constitutional dimension which are alleged to be the basis for release from custody may be pursued under the § 2255 process.

The Court agrees in part with the Government's jurisdictional argument. Because § 2255 textually requires that the petitioner be seeking release from custody, it should be apparent that § 2255 does not provide a basis for reviewing the amount of restitution to be paid to a victim under the Victim and Witness Protection Act. Recalculating and reducing (or even eliminating) the amount of restitution owed to a victim by a person in custody does not result in the petitioner's release from custody. Absent extraordinary circumstances (such as perhaps confinement for contempt of court for willful refusal to pay restitution), the reduction or elimination of a restitution obligation would not negate the underlying conviction nor otherwise hasten release from custody. Thus, Ground One seeking review of the amount of restitution is not cognizable under § 2255, and it will be dismissed for lack of jurisdiction.

Ground Two, however, may lie within § 2255's cognizable grounds. The text of § 2255 does not confine itself to grounds alleging violations of the

Constitution; it also includes violations of federal law, choosing the phrase "violation of the Constitution or laws of the United States," 28 U.S.C. § 2255 (emphasis added). Here, Ground Two asserts that federal law -- the U.S. Sentencing Guidelines -- was misapplied to greatly overstate the severity of the crime at sentencing by awarding a 12-level increase in Total Offense Conduct score under U.S.S.G. § 2B1.1(a)(2) when no points should have been counted because there allegedly was no loss. If the ground has merit, petitioner's Level 23 TOC score might have been reduced to Level 11, at least suggesting a large reduction in his advisory range under the Sentencing Guidelines.[5] In the event of success, a new sentencing would be mandated and a new Sentencing Guideline range determined by TOC 11, CHC III would become 12-18 months. Presuming for the sake of jurisdictional argument a new sentence in that range, the petitioner could be eligible for release from custody on time served, as he has already been confined approximately 28 months since March 27, 2015, as noted above. It would appear to be within the contemplation of Congress that the federal sentencing court may entertain a petition under § 2255 upon grounds of a violation of the U.S. Sentencing Guidelines where the

---

[5] It is quite possible that even if the loss to the lender was reduced by zero, Souels would have been held responsible for the financial loss to K.P., his pastoral congregant, who was found to be an especially vulnerable victim under U.S.S.G. § 3A1.1(b)(1) (PSR ¶¶ 144, 187) and who suffered financial loss at Souels' hands. (Id. at 144.) Because the money Souels took from K.P.'s bank account when he victimized her was also proceeds of the fraudulent mortgage loans, it was not counted a second time in the loss calculation at sentencing. The point need not be decided here because it is not determinative of the jurisdictional issue.

relief could include release from custody upon resentencing. The Court thus exercises jurisdiction over Ground Two, and it will discuss the merits below.[6]

### B. Ground Three: Ineffective Assistance of Counsel

In Ground Three, Souels alleges that defense counsel was constitutionally ineffective at sentencing by failing to object to the amount of loss and restitution owed to the victim because the victim suffered no loss when it sold the property and declared the entire mortgage debt paid from those proceeds. Had counsel been effective, Souels argues, the result of his sentencing would have been lower because there would have been no actual or intended loss for purposes of U.S.S.G. § 2B1.1(b)(1).

To prevail on a claim of ineffective assistance of counsel, Petitioner must demonstrate that (1) counsel's performance was so deficient as to deprive him of the representation guaranteed to him under the Sixth Amendment of the U.S. Constitution, and (2) the deficient performance prejudiced the defense by depriving the defendant of a fair trial or other criminal proceeding. Chaidez v. United States, 133 S. Ct. 1103, 1107 (2013); Strickland v. Washington, 466 U.S. 668, 687 (1984).

---

[6] While the Court does not have jurisdiction under § 2255 regarding Ground One, Petitioner makes the same arguments as to Ground One as those that are discussed herein on Grounds Two and Three pertaining to the correctness of the loss determination, which the Court addresses upon the merits.

9

Performance of counsel is constitutionally inadequate if it is not only deficient but falls below "prevailing professional norms" and was "outside the wide range of professionally competent assistance." Id. at 690.

To show prejudice from counsel's performance, Petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Rainey v. Varner, 603 F.3d 189, 197-98 (3d Cir. 2010) (quoting Strickland, 466 U.S. at 694).

### C. Determining Loss Upon Fraudulent Mortgage Loans

On both Grounds Two and Three, the threshold issue is whether the Court's determination of loss or intended loss from the fraudulent mortgage loans on Unit 203 was incorrect under U.S.S.G. § 2B1.1(b)(1). Under § 2B1.1(b)(1), the loss is calculated as the "greater of actual loss or intended loss." Application Note 3(A)(i) thereunder defines the "actual loss" as the "reasonably foreseeable pecuniary harm that resulted from the offense." Application Note 3(E)(ii) provides for a credit against the loss where collateral is recovered by the victim and disposed before sentencing, in an amount determined as follows:

> In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

This means that where the victim has recovered the loan collateral (here, title to Unit 203) and then disposes of it (here, by sale), the loss amount is reduced

10

by the amount the victim recovered from disposition. If, however, the victim has not disposed of the collateral before sentencing, Application Note 3(E)(ii) directs that the sentencing judge use the fair market value of the collateral at the time of sentencing. For such unsold collateral resulting from fraud involving a mortgage loan, the court is to use the fair market value of the collateral on the sentencing date, with a rebuttable presumption that the most recent tax assessment value is a reasonable estimate of the fair market value. U.S.S.G. § 2B1.1, Application Note 3(E)(iii). In all cases, a court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, Application Note 3(C).

Applying these precepts, the Court determined that the loss was the difference between the total amount of money loaned by West Coast ($478,256.26) and the amount the financial institution recovered when it resold the property after re-taking possession ($225,000.00), which is a loss of $253,256.26 related to K.P.'s fraudulent purchase of Unit 203.

West Coast Servicing acquired ownership and possession of the property in April of 2008, when K.P. signed over the deed in exchange for $1,000.00 (See Kraemer Report, supra, at 1.) This transaction gave the victim a deed in lieu of foreclosure. West Coast Servicing repurchased the property rather than going through a typically lengthy and costly foreclosure process. (Id.). Petitioner does not dispute that no one ever made a payment upon the K.P. mortgages and that they were in serious default when the lender took possession in April of 2008.

The method by which the commercial lender reacquires the property after a defaulted mortgage loan -- whether by foreclosure or deed in lieu of foreclosure -- does not matter to the calculation of loss. The Third Circuit has recognized that a defendant or third party making a "gratuitous transfer of the property" back to the commercial lender does not alter the loss calculations. United States v. Mummert, 34 F.3d 201, 204 (3d Cir. 1994).

There is likewise no dispute that the victim recovered $225,000.00 when it sold Unit 203, and that this amount is deducted from its loss on the fraudulent loans, pursuant to Application Note 3(E)(ii), supra. The Eighth Circuit has recognized that it is proper to calculate the amount of loss upon a fraudulent mortgage loan based on the "difference between the unpaid loan balances and the prices obtained for the properties at sheriff's sales or short sales." United States v. Mshihiri, 816 F.3d 997, 1011-12 (8th Cir. 2013). Whether the lender-victim disposes of the property by sheriff's sale or short sale is immaterial to the loss calculation, since either shows the victim's recovery upon disposition of the real property collateral. See id.; see also United States v. Engelmann, 720 F.3d 1005, 1013-14 (8th Cir. 2013). This method, which this Court employed at sentencing, provides the best estimate of the lender's actual loss. Moreover, Application Note 3(E)(ii) uses the broad term "disposition of the collateral", which does not limit the disposition to only a foreclosure sale. Such disposition certainly includes a direct sale by the lender to a new buyer, as in this case.

12

To suggest, as Souels does, that there is actually no loss because K.P.'s loans were canceled, is irrational. Selling Unit 203 upon reacquiring the collateral by deed in lieu of foreclosure constituted a commercially reasonable disposition of the sort practiced every day by lending institutions seeking to cut their losses. The lender's loss of more than a quarter-million dollars was the tangible consequence of making loans that would never have been made but for this conspiracy to commit fraud. The expedience of obtaining a deed in lieu of foreclosure does not change this fact.

The lender's successor, West Coast Servicing, having been defrauded, was motivated to minimize its loss on the loans collateralized by Unit 203. A short sale is a lawful disposition and nothing herein suggests that this short sale was commercially unreasonable. This is precisely the sort of "disposition" of collateral before sentencing referenced in Application Note 3(E)(ii), supra. Where such a disposition has been made, the amount recovered is credited against the gross loss, and no estimation of fair market value is required.

Finally, the determination of loss upon this fraudulent mortgage was not only consistent with Application Note 3(E), but it also did not lead to some unfair or unforeseeable result. Unit 203, like the other Wildwood properties transacted in this conspiracy, had an artificially inflated selling price to which the loan was addressed; these condominiums were "overbuilt by financially distressed developers. . . . [co-conspirators] agreed on elevated sales prices for financially distressed properties ... which were much higher than the developer's buyout price so that there would be a large amount of proceeds to

13

the co-conspirators from the sales of the properties after the closings took place." PSR ¶¶ 88-89. Thus, the sales price of Unit 203 was fraudulently elevated to justify the larger loans of $411,901.19 and $66,355.07, which generated substantial kickbacks for the co-conspirators, including Souels, from the purchase money, above what the developer required as the true lower sales price. When the Wildwood housing market collapsed in 2007-2008 due to the many fraudulent transactions in this conspiracy (which included 23 units in Wildwood Crest and North Wildwood, see PSR ¶ 95) and the nationwide downturn, the victim faced a difficult sales environment into which it resold the property for $225,000.00. This loss would not have occurred were it not for the fraud -- the mortgage loans would have been paid and no distress sale would have been necessary. The Court correctly determined the loss amount under U.S.S.G. § 2B1.1(b)(1) and Application Note 3(E).

Thus, Souels has failed to show that the loss amount was incorrect and that his attorney was deficient in failing to object. Counsel's performance was not deficient in any way, and Souels was not deprived of the representation guaranteed to him under the Sixth Amendment. Lastly, if counsel had objected, such argument would have had no merit and would have been rejected for the reasons stated above. The Petition will be denied as to Grounds Two and Three.

## III. CONCLUSION

For reasons stated above, the Petition under 28 U.S.C. § 2255 will be dismissed for lack of jurisdiction as to Ground One, and denied upon the merits as to Grounds Two and Three.

No certificate of appealability will be issued under 28 U.S.C. § 2253(c). Petitioner has not made a substantial showing of the denial of a constitutional right, as jurists of reason would not disagree with the outcome.

The accompanying Order will be entered.


**August 24, 2017**                            **s/ Jerome B. Simandle**
Date                                          JEROME B. SIMANDLE
                                                 United States District Judge